IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-123

No. 149PA20

Filed 29 October 2021

STATE OF NORTH CAROLINA

v.

JAMES EDWARD LEAKS


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 270 N.C. App. 317 (2020), finding no error after appeal from a judgment entered on 8 August 2018 by Judge Carla Archie in Superior Court, Mecklenburg County. Heard in the Supreme Court on 1 September 2021.

*Joshua H. Stein, Attorney General, by Mary Carla Babb, Special Deputy Attorney General, for the State-appellee.*

*William D. Spence for defendant-appellant.*

BARRINGER, Justice.

¶ 1    In this case, we review the Court of Appeals' holding that the trial court committed no error by declining to give defendant's requested modified self-defense instruction at trial. *State v. Leaks*, 270 N.C. App. 317, 324 (2020). Regardless of whether an error occurred, a party challenging jury instructions as erroneous must demonstrate on appeal that the error was prejudicial. Since defendant cannot meet this burden, we modify and affirm the decision of the Court of Appeals.

## I.    Factual and Procedural Background

On 16 August 2016, Darrell Cureton was helping his girlfriend, Sylvia Moore, with yardwork at her house. Ms. Moore's brother, Eric Moore, was also outside with them. As they were working, defendant and his friend, Calvin Mackin, walked down a side street adjoining the house. Witness testimony differed on what happened next.

According to Mr. Moore, defendant and Mr. Mackin were walking across the street from Ms. Moore's home when they asked Mr. Moore for a cigarette. Defendant and Mr. Mackin crossed the street and entered Ms. Moore's yard, Mr. Moore gave them a cigarette, and then they walked back across the street. Hearing the men talking, Mr. Cureton walked over toward Mr. Moore. Defendant, who at that point was back across the street, started staring at Mr. Cureton and patting the knife he carried on his hip. Defendant was around six feet tall and weighed about two hundred pounds. Mr. Cureton was around five-foot-five and weighed approximately 150 to 160 pounds.

Mr. Cureton walked over to his pickup truck, which was parked on the street in front of Ms. Moore's home, and picked up a two-by-four board from the truck bed. Mr. Cureton then said, "[Defendant], go on, I don't want no trouble" and started walking away from defendant, back toward Ms. Moore's house. According to Mr. Moore, Mr. Cureton held the two-by-four straight across in front of himself, with one hand on either end. Mr. Cureton never held the two-by-four like a baseball bat and

never swung it at defendant. When Mr. Cureton backed away, defendant sprinted across the street toward Mr. Cureton, holding the knife and exclaiming, "[T]hat will give me an excuse to kill [you]."

¶ 5        Mr. Moore further testified that as defendant drew close, Mr. Cureton dropped the two-by-four and tried to run away, but he ran into the wall of the house and fell. Defendant caught up to Mr. Cureton and stabbed him in the chest. After stabbing Mr. Cureton, defendant rejoined Mr. Mackin, and the two men slowly walked away.

¶ 6        Ms. Moore also testified at trial. According to Ms. Moore, Mr. Cureton was standing in the yard when defendant sprinted through the bushes in her yard and bumped Mr. Cureton. As defendant moved away, Ms. Moore saw that defendant was holding a knife and Mr. Cureton was clutching his hands to his chest while blood started to appear. Ms. Moore further testified that before dating Mr. Cureton, she had dated defendant for five years.

¶ 7        Next, Veronique Streeter, a social worker with no relationship to any of the individuals directly involved in this case, testified. At the time of the incident, Ms. Streeter was leaving a building that was a block over from Ms. Moore's house. Ms. Streeter testified that upon hearing a commotion, she looked over and saw Mr. Cureton with his back to the house holding up a piece of wood, with a hand on each end, to protect himself from being hit. Ms. Streeter never saw Mr. Cureton swing the piece of wood at defendant or take offensive action. Instead, as Ms. Streeter watched,

she saw defendant come toward Mr. Cureton, jabbing at him. After making the jabbing motions, defendant walked away, and Ms. Streeter saw a red patch start to appear on the front of Mr. Cureton's white shirt.

¶ 8        Accompanying Ms. Streeter that day was Theresa McCormick-Dunlap, who also had no relation to any of the individuals directly involved in this case. Ms. McCormick-Dunlap testified that when she looked towards Ms. Moore's house, she saw Mr. Cureton retreating as defendant pursued him. Mr. Cureton was holding a long piece of wood defensively in front of himself like a shield and blocking defendant's swings. Ms. McCormick-Dunlap never saw Mr. Cureton use the two-by-four like a club, swing it offensively, or even move towards defendant. However, Ms. McCormick-Dunlap did observe defendant making jabbing motions while he chased Mr. Cureton. Ms. McCormick-Dunlap testified that defendant was "pretty determined to get at [Mr. Cureton]," while Mr. Cureton, in contrast, was retreating and not even trying to fight back. Eventually, Ms. McCormick-Dunlap saw defendant land a good blow and then "swagger[ ] off" looking satisfied. When she approached Mr. Cureton, Ms. McCormick-Dunlap saw blood on his shirt.

¶ 9        Defendant testified to an alternative version of events. According to defendant, he and Mr. Mackin were walking down the sidewalk across the street from Ms. Moore's house when they saw Mr. Moore. Mr. Mackin asked Mr. Moore for a cigarette. While Mr. Mackin walked over to retrieve the cigarette, defendant stayed across the

street on the sidewalk. Mr. Cureton then walked to the edge of the lawn and told him to, "[G]o ahead on" and, "[K]eep it moving." In the meantime, Mr. Mackin had obtained a cigarette and started back across the street to defendant. Mr. Mackin then said, "[L]ook out," and defendant heard some "pitter-patter." When he turned around, defendant saw Mr. Cureton swinging at him with a two-by-four held like a baseball bat.

¶ 10      Defendant further testified that Mr. Cureton struck defendant on his back and then continued hitting defendant with the two-by-four. Defendant tried to block the blows with his hands and grab the two-by-four but was unsuccessful. According to defendant, he started to fear for his life because he could not get to his knife—a large Gerber the size of a machete. Mr. Cureton kept landing blows, striking defendant on his head, neck, forearms, knee, and shoulder. Defendant began to feel dizzy and see stars. After a couple more hits, defendant fell down, unstrapped his knife, and stabbed Mr. Cureton in the chest one time. Mr. Cureton stopped hitting defendant and ran back to the house. Defendant asserted that his only intent when he stabbed Mr. Cureton was to try to stop Mr. Cureton from beating him.

¶ 11      Mr. Mackin also testified during defendant's case-in-chief. Mr. Mackin testified that he and defendant were so close that they called each other cousins. According to Mr. Mackin, he and defendant were walking by Ms. Moore's house when Mr. Mackin heard some "hollering." Mr. Cureton then walked quickly toward defendant, holding

a stick in the air like he was going to hit defendant on the head. Mr. Cureton swung the stick at defendant, but defendant dodged it. However, Mr. Mackin testified that he did not see anything that happened afterwards between defendant and Mr. Cureton.

¶ 12 Shortly after being stabbed by defendant, Mr. Cureton died. Dr. Jonathan David Privette, who examined Mr. Cureton's body, testified that he had suffered from two knife wounds. First, Mr. Cureton had sustained a laceration to his left shoulder. Second, Mr. Cureton had been stabbed in his left chest by a knife that was thrust in, partially removed, and then thrust in again one to two more times. The stab to the chest was severe enough to fracture a rib, perforate Mr. Cureton's lung at three separate locations, and pierce his heart, causing Mr. Cureton's death.

¶ 13 Additionally, two police officers and a medical professional who responded to the incident testified about defendant's appearance shortly after the stabbing occurred. According to the officers, the only injuries they observed were on defendant's arms, and they were minor. Additionally, the officers stated that defendant had no difficulties standing or walking. As for the medic who attended to defendant, she testified that though defendant complained of head pain, the medic could not find any injury to his head. The only injuries the medic observed were the minor injuries to defendant's arms and a swollen knee.

¶ 14 After both parties rested their case at trial, defendant requested the trial court

give a modified version of North Carolina Pattern Jury Instruction 206.10, which outlines the elements of self-defense. The first element of Pattern Jury Instruction 206.10 states that a defendant must believe it necessary "to kill" the victim. N.C.P.I.– Crim 206.10. Defendant requested that the trial court modify the instruction to instead state that a defendant must believe it necessary "to use deadly force against the victim."[1] The State opposed defendant's proposed modification. After listening to both sides' arguments, the trial court denied defendant's request and instructed the jury using Pattern Jury Instruction 206.10 without modification. Immediately after the trial court finished instructing the jury, defendant renewed his objection to the unmodified self-defense instruction. On 8 August 2018, the jury returned a verdict of guilty of second-degree murder. Defendant appealed.

¶ 15      Before the Court of Appeals, defendant argued that the trial court (1) abused its discretion in denying defendant's motion for jury view, (2) erred by instructing the jury that defendant needed to have believed it was necessary "to kill" the victim in order to have acted in self-defense, and (3) erred in determining that defendant had a prior record level of IV. *Leaks*, 270 N.C. App. at 320–21. In a unanimous decision, the Court of Appeals found no error by the trial court. *Id.* at 321, 324, 326.

---

[1] We note that defendant's request that the trial court substitute the words "to use deadly force" for the words "to kill" was based on footnote four in Pattern Jury Instruction 206.10. Given the confusion that this footnote caused during trial in this case, it is recommended that the North Carolina Pattern Jury Instruction Committee review N.C.P.I.– Crim 206.10.

¶ 16        Defendant requested review by this Court pursuant to N.C.G.S. § 7A-31 to address the Court of Appeals' decision that the trial court did not err in giving Pattern Jury Instruction 206.10 without defendant's requested modification. We allowed defendant's petition.

## II.    Standard of Review

¶ 17        In criminal cases, appellate courts review challenges to jury instructions differently depending on whether the challenge was properly preserved at trial. When a party properly preserves an objection to a jury instruction, appellate courts review the instruction for harmless error pursuant to N.C.G.S. § 15A-1443(a). *State v. Lawrence*, 365 N.C. 506, 512 (2012). Unpreserved objections, on the other hand, are reviewed only for plain error. *Id.* To properly preserve an objection to a jury instruction, the appellate rules require that a party object before the jury retires to consider its verdict and state "distinctly that to which objection is made and the grounds of the objection." N.C. R. App. P. 10(a)(2). Here, defendant properly preserved his objection. Thus, we review for harmless error under N.C.G.S. § 15A-1443(a). *Lawrence*, 365 N.C. at 512.

¶ 18        " 'The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence' and 'promote[ ] public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of

immaterial error.' " *State v. Malachi*, 371 N.C. 719, 734 (2018) (quoting *Rose v. Clark*, 478 U.S. 570, 577 (1986)). Accordingly, harmless-error review requires a defendant show that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises," unless the error relates to a constitutional right. N.C.G.S. § 15A-1443(a) (2019). At no point in this case has defendant alleged that the unmodified jury instruction violated a constitutional right. Therefore, the burden of showing prejudice is upon defendant. *Lawrence*, 365 N.C. at 513.

## III. Analysis

¶ 19        Defendant has not shown a reasonable possibility that had the modified self-defense instruction been given, a different result would have been reached at trial. While the trial court instructed the jury that to have acted in self-defense defendant needed to believe it necessary to kill the victim, the trial court further instructed the jury that this belief must be reasonable given "the fierceness of the assault, if any, upon [defendant]" as perceived by "a person of ordinary firmness." Defendant did not object to the reasonableness portion of the instruction at trial and does not challenge it on appeal. Accordingly, even if the trial court had instructed the jury that defendant needed to believe only that deadly force was necessary, as opposed to believing he needed to kill the victim, the jury would still need to have found that this belief was reasonable. Further, the trial court instructed the jury that, as a separate

requirement of self-defense, defendant must not have used "excessive force," meaning, "more force than reasonably appeared to the [d]efendant to be necessary at the time of the killing."

¶ 20        At trial, the medical testimony revealed that, at most, defendant had suffered minor arm injuries and a swollen knee that were treated with a bandage and ice pack. In contrast, defendant admitted that he stabbed Mr. Cureton in the chest with his Gerber knife—a knife so large that it looked like a machete. As testified to by the doctor who examined Mr. Cureton's body, this one stab wound to Mr. Cureton's chest was a highly lethal wound. The wound reflected that the knife was thrust in, partially removed, and then thrust in again one to two more times, causing a fractured rib, a perforated lung at three separate locations, a pierced heart, and ultimately Mr. Cureton's death. Defendant tendered no medical evidence to contradict this testimony.

¶ 21        Accordingly, defendant has not shown a reasonable possibility that even if the trial court had modified the self-defense instruction as requested, the jury would have found that defendant acted in self-defense. The uncontradicted medical evidence strongly suggests that defendant's use of deadly force was not reasonable under the circumstances but rather that it was excessive. Defendant's requested self-defense instruction, if given, would not have changed the trial court's charge to the jury that defendant's use of force must be reasonable and not excessive. As a result, defendant

cannot show a reasonable possibility that a different result would have occurred at trial.

## IV.    Conclusion

Since defendant has not shown a reasonable possibility that a different result would have occurred at trial if the alleged error had not occurred, he cannot meet his burden of showing prejudice under harmless-error review. Therefore, we modify and affirm the decision of the Court of Appeals.

MODIFIED AND AFFIRMED.